1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LESLIE SANDERS
O/B/O JEFFREY SCOTT SANDERS,

                  Plaintiff,

     v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                 Defendant.

NO.  C14-502-TSZ-JPD

REPORT AND
RECOMMENDATION

Plaintiff Leslie Sanders, on behalf of her deceased husband Jeffrey Scott Sanders,

appeals the final decision of the Commissioner of the Social Security Administration

("Commissioner") which denied his applications for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, after a hearing before an

administrative law judge ("ALJ").  For the reasons set forth below, the Court recommends that

the Commissioner's decision be REVERSED and REMANDED for an award of benefits.

              I.        FACTS AND PROCEDURAL HISTORY

Born in 1967, plaintiff was forty-two years old on his alleged disability onset date.

Administrative Record ("AR") at 15, 221.  He had a high school education, although he

suffered from dyslexia and was in special educations classes for reading and writing as a child.

REPORT AND RECOMMENDATION - 1

AR at 24, 226, 325. His past work experience includes employment as a building maintenance laborer, furniture mover, school bus driver, shipyard laborer, and shuttle bus driver. AR at 42, 92, 195-96. Plaintiff was last gainfully employed in August 2009, before he suffered a subarachnoid hemorrhage ("SAH") on August 24, 2009 that required neurosurgery and a 10-day hospitalization in the intensive care unit at Harborview Medical Center ("HRM"). AR at 41, 196, 285, 288, 711.

Plaintiff applied for DIB on June 10, 2011, alleging an onset date of August 24, 2009. AR at 197-207. The Commissioner denied plaintiff's claim initially and on reconsideration. AR at 100-25. Plaintiff requested a hearing, but died one month prior to the scheduled hearing date. AR at 15, 701, 703. Plaintiff contends that he was disabled due to blood clots in his legs (deep vein thromboses) and lungs (pulmonary embolisms) as a result of his Factor VIII disorder which caused his blood to over-coagulate, as well as congenital hydrocephalus in his head. AR at 711.[1] Plaintiff was given Coumadin to thin his blood and instructed to walk every day one to two hours to prevent clot formation, as well as elevate his legs at rest. AR at 711. In June 2011, August 2011, and January 2012, plaintiff developed additional blood clots in his legs and groin. AR at 244, 374. In July 2012, he had another SAH. At that time, an MRI of his brain and full spine were performed, revealing multiple tumors on his lumbar spine. AR at 700. When doctors performed a laminectomy for resection of one of the masses, plaintiff developed a pulmonary embolism and died on July 29, 2012, at age 45. AR at 700-03. His

---

[1] As the ALJ notes in her decision, there was "very little information regarding the claimant's specific allegations to the Social Security Administration about his limitations." AR at 19. Indeed, plaintiff's wife completed the functional report on plaintiff's behalf. AR at 234-41. However, "[h]e did provide a general list of mental and physical problems," which included "effects of brain hemmorage (sic), blood disorder, learning [disability], focus and concentration issues, short term memory loss, balance issues, sleeping problems, depression, blood disorder, shoulder injury. . ." AR at 225. The ALJ asserts that she "accept[ed] these limited allegations . . . for the periods before and after January 21, 2012." AR at 19-20.

REPORT AND RECOMMENDATION - 2

wife, Leslie Sanders, was substituted as a party and attended the administrative hearing on August 29, 2012.  AR at 32-99, 263.

On November 16, 2012, the ALJ issued a partially favorable decision.  Specifically, the ALJ denied benefits prior to January 21, 2012, based on her finding that plaintiff could perform a specific job existing in significant numbers in the national economy.  AR at 11-31. The ALJ found that plaintiff's severe impairments included adjustment disorder, intracranial injury (subarachnoid hemorrhage), venous insufficiency (both superficial and deep vein thrombosis), hydrocephalus, headaches, lumbar tumors and laminectomy, and pulmonary embolism.  AR at 17.  The ALJ concluded that plaintiff became disabled as of January 21, 2012, and remained disabled through July 29, 2012, the date he died.  AR at 25.

Plaintiff's request for review by the Appeals Council was denied, AR at 1-5, making the ALJ's ruling the "final decision" of the Commissioner as that term is defined by 42 U.S.C. § 405(g).  On April 7, 2014, plaintiff timely filed the present action challenging the Commissioner's decision.  Dkt. 1.

## II.    JURISDICTION

Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## III.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits when the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th Cir. 2005).  "Substantial evidence"  is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750

REPORT AND RECOMMENDATION - 3

(9th Cir. 1989).  The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving any other ambiguities that might exist.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld.  *Id.*

The Court may direct an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose."  *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)).  The Court may find that this occurs when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Id.* at 1076-77; *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that erroneously rejected evidence may be credited when all three elements are met).

## IV.   EVALUATING DISABILITY

As the claimant, Mr. Sanders bears the burden of proving that he is disabled within the meaning of the Social Security Act (the "Act").  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (internal citations omitted).  The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment which has lasted, or is expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is disabled under the Act only if his impairments are of such severity that he is unable to do his previous work, and cannot, considering his age,

education, and work experience, engage in any other substantial gainful activity existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The Commissioner has established a five step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the burden of proof during steps one through four.  At step five, the burden shifts to the Commissioner.  *Id.*  If a claimant is found to be disabled at any step in the sequence, the inquiry ends without the need to consider subsequent steps.  Step one asks whether the claimant is presently engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).[2]  If he is, disability benefits are denied.  If he is not, the Commissioner proceeds to step two.  At step two, the claimant must establish that he has one or more medically severe impairments, or combination of impairments, that limit his physical or mental ability to do basic work activities.  If the claimant does not have such impairments, he is not disabled.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant does have a severe impairment, the Commissioner moves to step three to determine whether the impairment meets or equals any of the listed impairments described in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d).  A claimant whose impairment meets or equals one of the listings for the required twelve-month duration requirement is disabled.  *Id.*

When the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, the Commissioner must proceed to step four and evaluate the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).  Here, the

---

[2] Substantial gainful activity is work activity that is both substantial, i.e., involves significant physical and/or mental activities, and gainful, i.e., performed for profit.  20 C.F.R. § 404.1572.

Commissioner evaluates the physical and mental demands of the claimant's past relevant work to determine whether he can still perform that work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If the claimant is able to perform his past relevant work, he is not disabled; if the opposite is true, then the burden shifts to the Commissioner at step five to show that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 416.920(g); *Tackett*, 180 F.3d at 1099, 1100.  If the Commissioner finds the claimant is unable to perform other work, then the claimant is found disabled and benefits may be awarded.

V.      DECISION BELOW

On November 16, 2012, the ALJ issued a decision finding the following:

1.   The claimant met the insured status requirements of the Social Security Act through July 29, 2012.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset date.

3.   The claimant has had the following severe impairments: adjustment disorder, intracranial injury (subarachnoid hemorrhage), venous insufficiency (superficial and deep vein thrombosis), hydrocephalus, headaches, lumbar tumor and laminectomy, and pulmonary embolism.

4.   Since August 24, 2009, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   I find that prior to January 21,2012, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he was able to lift or carry up to 20 pounds occasionally and 10 pounds frequently; he was able to stand or walk up to 2 hours at a time and sit up to 6 hours total in an 8-hour workday; he needed to change positions after 1 hour  of sitting  for a few minutes at or near his workstation; he was able to occasionally climb ramps/stairs and balance; he was able to frequently stoop, kneel, crouch, and crawl; he was required to avoid concentrated exposure to heights and machinery (i.e. hazards); and he had sufficient concentration to understand, remember, and carry out simple repetitive tasks and to deal with simple workplace changes.

6.  I find that since January 21, 2012, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he was able to lift or carry up to 20 pounds occasionally and 10 pounds frequently; he was able to stand or walk up to 2 hours and sit up to 6 hours per 8-hour workday; he needed to change positions after 1 hour of sitting for a few minutes at or near his workstation; he was able to occasionally climb ramps/stairs and balance; he was able to frequently stoop, kneel, crouch, and crawl; he was required to avoid concentrated exposure to heights and machinery (i.e. hazards); and he had sufficient concentration to understand, remember, and carry out simple repetitive tasks and to deal with simple workplace changes.  However, he would have been off-task 20% of the workday.

7.  The claimant was unable to perform any past relevant work.

8.  Prior to the established disability onset date, the claimant was a younger individual age 18-49.  The claimant's age category had not changed since the established disability onset date.

9.  The claimant had at least a high school education and is able to communicate in English.

10. Prior to January 21, 2012, transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled," whether or not the claimant had transferable job skills.  Beginning on January 21, 2012, the claimant had not been able to transfer job skills to other occupations.

11. Prior to January 21, 2012, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

12  Beginning on January 21, 2012, considering the claimant's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant can perform.

13. The claimant was not disabled prior to January 21, 2012, but became disabled on that date and has continued to be disabled through July 29, 2012, the date of his death.

AR at 17-25.

# VI.   ISSUES ON APPEAL

The principal issues on appeal are:

1.    Did the ALJ err by rejecting the opinions of examining psychologists Myron Goldberg, Ph.D., and Diana Cook, Ph.D.?

2.    Did the ALJ err in evaluating the other source opinions of treating nurse practitioner Pamela Williams, A.R.N.P., as well as the lay opinions of Leslie Sanders, Kristina Cortese, Bridget Anderson, and Beth Ann Warner?

3.    Did the ALJ err by finding that plaintiff was not disabled before January 21, 2012?

4.    Did the evidence Dr. Goldberg and Ms. Williams submitted to the Appeals Council establish that the ALJ's decision was not supported by substantial evidence?

5.    Did the ALJ's RFC assessment capture all of plaintiff's limitations?

Dkt. 12 at 1-2; Dkt. 15 at 2.

# VII.   DISCUSSION

A.    The ALJ Erred in Evaluating the Medical Opinion Evidence

*1.    Standards for Reviewing Medical Evidence*

As a matter of law, more weight is given to a treating physician's opinion than to that of a non-treating physician because a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). A treating physician's opinion, however, is not necessarily conclusive as to either a physical condition or the ultimate issue of disability, and can be rejected, whether or not that opinion is contradicted. *Magallanes*, 881 F.2d at 751. If an ALJ rejects the opinion of a treating or examining physician, the ALJ must give clear and convincing reasons for doing so if the opinion is not contradicted by other evidence, and specific and legitimate reasons if it is. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1988). "This can be done by setting out a detailed and thorough

REPORT AND RECOMMENDATION - 8

summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (citing *Magallanes*, 881 F.2d at 751). The ALJ must do more than merely state his/her conclusions. "He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citing *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)). Such conclusions must at all times be supported by substantial evidence. *Reddick*, 157 F.3d at 725.

The opinions of examining physicians are to be given more weight than non-examining physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Like treating physicians, the uncontradicted opinions of examining physicians may not be rejected without clear and convincing evidence. *Id.* An ALJ may reject the controverted opinions of an examining physician only by providing specific and legitimate reasons that are supported by the record. *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005).

Opinions from non-examining medical sources are to be given less weight than treating or examining doctors. *Lester*, 81 F.3d at 831. However, an ALJ must always evaluate the opinions from such sources and may not simply ignore them. In other words, an ALJ must evaluate the opinion of a non-examining source and explain the weight given to it. Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *2. Although an ALJ generally gives more weight to an examining doctor's opinion than to a non-examining doctor's opinion, a non-examining doctor's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Orn*, 495 F.3d at 632-33.

2.     *Myron Goldberg, Ph.D.*

Dr. Goldberg performed a neuropsychological evaluation of plaintiff in April 2012 to evaluate his ongoing cognitive problems. The evaluation lasted a total of seven hours, took

place over several days, and involved interviews of plaintiff and his wife, review of plaintiff's medical records, and twenty-two psychometric tests, including one to detect malingering.  AR at 528-35.  With respect to plaintiff's medical history, Dr. Goldberg discussed plaintiff's "spontaneous subarachnoid hemorrhage in 2009 and noted, subsequent decline in his cognitive functioning."  AR at 528.  Dr. Goldberg observed that although plaintiff was discharged home following his SAH in August 2009, "[c]ognitive problems persisted and he was seen by Dr. Jennifer Devine for Rehabilitation Medicine consultation on 2/13/2012.  Dr. Devine noted Mr. Sanders' and his wife's report of significant recent and remote memory problems, along with trouble in sustaining attention over time."  AR at 528.  Dr. Goldberg further noted that since plaintiff's SAH in 2009, he attempted to obtain employment through DVR and a job club service at Harborview.  With the aid of "these services, he was placed in [a] cabulance driver job in September 2011, but failed the 30-day trial.  More recently, he has been a volunteer driver for a senior living program, from which he recently resigned."  AR at 529.  With respect to Dr. Goldberg's clinical interview of plaintiff, he noted plaintiff's self-report of "problems with mental processing speed, initiating and maintaining attentional focus on tasks, resisting distraction, short-term memory . . . and word finding.  He believes that most of his cognitive problems surfaced after his subarachnoid hemorrhage."  AR at 529-30.  Plaintiff also reported "balance problems . . . since the SAH."  AR at 530.

During the psychometric testing, plaintiff was deemed cooperative and appeared to give his best effort in most instances.  AR at 530.  His performance was noted to be slow and his fatigue was evident; he appeared to have trouble staying awake at times.  AR at 530.[3]

_____

[3] Plaintiff was evaluated by a sleep specialist for excessive daytime sleepiness that began after his SAH in 2009.  AR at 362.  He would fall asleep at the dinner table and during conversations. AR at 386.  Plaintiff was diagnosed with sleep apnea and treated with a CPAP machine. AR at 353.  Plaintiff argues, without citation to any medical evidence, that in

REPORT AND RECOMMENDATION - 10

1   Plaintiff's IQ score was 67, which is in the extremely low range (first percentile). AR at 531.

2   His general ability index ("GAI") was also low, placing him in the second percentile. AR at

3   531. Similarly, his working memory was 69, placing him in the second percentile. AR at 531.

4   After reviewing all the examination results, which were considered valid, Dr. Goldberg

5   concluded as follows:

> Findings from the current evaluation show widespread cognitive difficulties that likely represent historical deficiencies (e.g. learning difficulties as a child) as well as *more recent, diffuse declines associated with his subarachnoid hemorrhage and possibly chronic hydrocelphalus*. In terms of functional implications, the difficulties evidenced in attention, speed of mental processing, memory, and executive functioning are particularly concerning. Given their severity, these latter problems could be expected to impact the quality and consistency of other cognitive functions and interfere with his performance especially in settings or on tasks that require a good ability to sustain attention and resist distraction, mental multitasking, rapid information processing, efficient learning and recall of new information, novel complex problem solving and decision making, efficient organization and planning, and/or rapid adaptation to changing rules or principles (thinking flexibility).

13  AR at 534 (emphasis added). Dr. Goldberg opined that "in terms of work, Mr. Sanders, at this

14  point, is not considered ready, from a cognitive standpoint, to return to gainful employment."

15  AR at 534. He thought plaintiff appeared capable of participating in a supervised, voluntary

16  work setting that involved scheduled, more routine types of productive activity and afforded

17  him some control over the pace of his work performance, such as a traumatic brain injury

18  clubhouse. AR at 534.[4] He also recommended that plaintiff continue therapy for his cognitive

19  functioning problems, and consider in-home therapies. AR at 535.

20          The ALJ's entire discussion of Dr. Goldberg's evaluation and opinion consisted of two

21  sentences in which the ALJ appeared to adopt Dr. Goldberg's opinion that plaintiff was unable

22  ---
   hindsight plaintiff's excessive fatigue may have been an additional side effect of his tumors.
   Dkt. 12 at 5 n.1.

23      [4] Dr. Goldberg described a traumatic brain injury clubhouse as "a day treatment
   program that provides structure activities, including pre-employment tasks, and interpersonal

24  contacts and support." AR at 535.

REPORT AND RECOMMENDATION - 11

1  to work – but only with respect to the period after January 21, 2012.  AR at 22.  Specifically,

2  the ALJ noted that "Myron Goldberg, Ph.D., stated in May 2012 that the claimant was not

3  'ready' for work.  Dr. Goldberg indicated the claimant's capacity to do voluntary work in a

4  supervised setting where he would have the ability to control his work pace."  AR at 22 (citing

5  AR at 534).

6          The Court agrees with plaintiff's argument that the ALJ erred by failing to

7  acknowledge the fact that Dr. Goldberg identified the onset of plaintiff's severe cognitive

8  difficulties as plaintiff's "spontaneous subarachnoid hemorrhage in 2009."  AR at 534.  Indeed,

9  Dr. Goldberg's May 2012 evaluation clearly links the onset of plaintiff's disability to his

10 "spontaneous subarachnoid hemorrhage in 2009, [with] subsequent decline in his cognitive

11 functioning."  AR at 528.  Immediately following the summary of plaintiff's test results, Dr.

12 Goldberg asserts that plaintiff "suffered a spontaneous subarachnoid hemorrhage in 2009 in the

13 contest of a history of chronic hydrocephalus and a problematic blood clotting condition.

14 Declines in cognitive functioning since the hemorrhage in 2009 have been noticed and limited

15 his functional status, including ability to work."  AR at 534.  Dr. Goldberg then goes on to

16 explain, as discussed above, how plaintiff's "widespread cognitive difficulties . . . represent

17 historical deficiencies . . . as well as more recent, diffuse declines associates with his

18 subarachnoid hemorrhage and possibly chronic hydrocephalus."  AR at 534.

19          Thus, Dr. Goldberg's evaluation is not consistent with the ALJ's conclusion that

20 plaintiff's disability began on January 21, 2012.  However, the ALJ did not provide any

21 reasons for rejecting this aspect of Dr. Goldberg's opinion, which directly supports plaintiff's

22 argument that his disability began on August 24, 2009, the date of his first SAH.  AR at 22.

23          One month after the ALJ issued her November 16, 2012 written decision finding that

24 plaintiff's disability began in January 2012, rather than August 2009, plaintiff's counsel

REPORT AND RECOMMENDATION - 12

1   obtained a letter from Dr. Goldberg further clarifying his opinion on this issue.  AR at 708-10.

2   Dr. Goldberg asserted that he had gained first-hand knowledge of plaintiff's cognitive and

3   psychological status during his neuropsychological evaluation of him in April and May 2012,

4   and "based on the history in this case, Mr. Sanders' inability to maintain competitive

5   employment began in August 2009."  AR at 708.  Specifically, in his letter dated December 20,

6   2012, Dr. Goldberg opined:

7
> From what I know about his history, he was competitively employed prior to his
> subarachnoid hemorrhage (SAH) in 2009.  Because of difficulties in returning to
> the workforce following the SAH occurrence, he became involved with the
> Division of Vocational Rehabilitation (DVR) and participated in the job club
> service at Harborview Medical Center (HMC).  The HMC job club service is
> designed specifically for persons with cognitive functioning problems and who
> need systematic planning and supervision to increase their changes of successfully
> returning to competitive work.  It was through the services provided by DVR and
> the HMC job club that he was placed in a cabulence driver job trial in September
> 2011, more than 2 years after his SAH.  He failed the 30-day trial and was let go.
> After which, he became a volunteer driver for a senior living program.

13  AR at 708.[5]  Dr. Goldberg stated that "given what is known about his vocational history and

14  his cognitive presentation in the neuropsychological examination, I would date his inability to

15  work from a cognitive standpoint back to his 2009 SAH."  AR at 709.[6]

16

17          [5] Plaintiff's wife, Leslie Sanders, testified at length during the administrative hearing
18  regarding the difficulties plaintiff had performing his duties as a volunteer driver for the senior
    living program in Lake Forest Park even though on any given day he was only responsible for
19  picking up a handful of "the same people on the same route in our neighborhood."  AR at 63-
    66.  She also testified that due to his poor performance, he was passed up for paying positions
20  when they came up.  AR at 65.
            [6] Finally, with respect to other physicians' mini-mental status examinations that may
21  conflict with his findings, Dr. Goldberg opined that mini-mental status examinations are "quite
    useful in providing a very brief evaluation of a person's cognitive functioning abilities," but
22  are limited in scope and therefore "may not have sufficient sensitivity or breadth to detect the
    full range of cognitive functioning difficulties a person may be experiencing."  AR at 710.  By
23  contrast, comprehensive neuropsychological evaluations, such as the ones Dr. Goldberg
    conducted on plaintiff, "offer more sensitivity to detect a given problem and far greater breadth
24  (examines more cognitive domains and/or aspects of cognitive domains)."  AR at 710.

REPORT AND RECOMMENDATION - 13

The Commissioner asserts that the ALJ did not err in evaluating Dr. Goldberg's opinion because "rather than rejecting the psychologist's opinion, the ALJ relied on it as evidence Plaintiff had remained disabled from January 21, 2012 through the date of his death on July 29, 2012 . . . The ALJ reasonably concluded Plaintiff became disabled on January 21, 2012, because 'his overall condition materially changed' on that day after he went to the emergency room due to a deep vein thrombosis." Dkt. 15 at 11 (citing AR at 21-22, 690-92).  As discussed above, however, the Commissioner's argument ignores the fact that Dr. Goldberg expressly and repeatedly linked plaintiff's cognitive difficulties to his August 2009 SAH and not his January 2012 deep leg thrombosis, which was deemed "superficial."  AR at 690-92.

Accordingly, the Court agrees with plaintiff's argument that Dr. Goldberg's evaluation shows that plaintiff was unable to perform work existing in the national economy at step five because "Mr. Sanders would have been off task at least 20% of the day since his SAH in August 2009, not as of January 21, 2012, as the ALJ found." Dkt. 12 at 7-8.  The ALJ erred by failing to provide any reason to reject Dr. Goldberg's opinion about the onset of plaintiff's cognitive limitations.  In addition, Dr. Goldberg's neuropsychological testing "supports a need for additional supervision" of plaintiff in the workplace, particularly in light of the VE's testimony that an individual who was off task for 20% of the time, missed work more than twice a month, or needed extra supervision could not perform any work.  *Id.* (citing AR at 94-97).  As discussed below, as a result of the ALJ's erroneous evaluation of the medical and lay opinion evidence, substantial evidence does not support the ALJ's decision.

3.    *Diana Cook, Ph.D.*

Dr. Cook performed a psychological evaluation of plaintiff on May 25, 2010, which included a clinical interview, review of medical records, and psychological testing (although not a comprehensive neuropsychological evaluation).  AR at 324-31.  With respect to

REPORT AND RECOMMENDATION - 14

1  plaintiff's "working memory, or the ability to hold information temporarily in memory with the

2  purpose of using that information to perform a task," Dr. Cook found that plaintiff's "ability to

3  hold visual-spatial and auditory information falls within the Extremely Low range, exceeding

4  only 1% of his peers.  His score suggests he loses information from awareness more quickly

5  than do his age-mates."  AR at 328.  Dr. Cook found that his "scores overall indicate that the

6  claimant's working memory capacity, as estimated by the WMI, is in the Extremely Low

7  classification range.  His immediate and delayed memory performance scores are in the High

8  Average, and Average range, respectively."  AR at 329.  Dr. Cook diagnosed plaintiff with an

9  adjustment disorder and a GAF of 50-53.  AR at 329.[7]  At the time of the evaluation, plaintiff

10  was still involved in DVR to help determine if he had skills to engage in alternative

11  employment.  AR at 330.  However, Dr. Cook did not identify any functional abilities or

12  limitations of her own.

13          The ALJ summarized Dr. Cook's opinion, mistakenly providing that Dr. Cook "noted

14  that he did not answer questions in a straightforward manner," AR at 21, when in fact, Dr.

15  Cook's comment was that plaintiff "does seem to answer questions in a straightforward

16  manner."  AR at 330.  The ALJ also stated that Dr. Cook's opinion was consistent with the

17  opinions of the state agency mental consultants Dr. Snyder and Dr. Bailey, who opined that

18  plaintiff "had no severe mental impairment" prior to January 2012.  AR at 21.  She stated that

19

20          [7] The GAF score is a subjective determination based on a scale of 1 to 100 of "the
clinician's judgment of the individual's overall level of functioning."  AMERICAN PSYCHIATRIC
ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000).

21  A GAF score falls within a particular 10-point range if either the symptom severity or the level
of functioning falls within the range.  *Id.* at 32.  For example, a GAF score of 51-60 indicates

22  "moderate symptoms," such as a flat affect or occasional panic attacks, or "moderate difficulty
in social or occupational functioning."  *Id.* at 34.  A GAF score of 41-50 indicates "[s]erious

23  symptoms," such as suicidal ideation or severe obsessional rituals, or "any serious impairment
in social, occupational, or school functioning," such as the lack of friends and/or the inability

24  to keep a job.  *Id.*

REPORT AND RECOMMENDATION - 15

1    "Dr. Cook's evaluations were largely supportive of Dr. Snyder's and Dr. Bailey's assessments

2    as well as with respect[] to his cognitive and social functions."  AR at 21.

3            Thus, the ALJ did not provide any reasons for rejecting Dr. Cook's opinion regarding

4    plaintiff's extremely low working memory.  AR at 21.  Rather, the ALJ noted that "Dr. Cook

5    noted problems with memory but gave no specific work related limitation in her assessment.  I

6    err in his favor by finding that he could have performed only simple repetitive work tasks and

7    dealt with simple changes, which encompasses both his difficult with memory and need for a

8    less demanding environment."  AR at 21.

9            Plaintiff contends that the ALJ erred by failing to provide a reason for discounting Dr.

10   Cook's findings regarding plaintiff's working memory, which plaintiff argues was so low that

11   it (along with his other cognitive limitations) rendered him unable to work.  Dkt. 12 at 16.  The

12   Commissioner responds that "the ALJ specifically acknowledged Dr. Cook's statement about

13   plaintiff's 'extremely low working memory,' provided two reasons to discount this observation

14   on but one facet of his memory, but still accounted for the observation in her RFC finding."

15   Dkt. 15 at 6 (citing AR at 21).  "Thus, contrary to Plaintiff's contention, the ALJ did not reject

16   Dr. Cook's opinion on his working memory, she actually adopted it."  *Id*. at 7.

17           As a threshold matter, the Court notes that Dr. Cook's test results regarding plaintiff's

18   "extremely low" working memory, which exceeded only 1% of his peers, corroborates the

19   "working memory" test results of Dr. Goldberg, which placed plaintiff in the second percentile.

20   AR at 531.  As discussed above, Dr. Goldberg interpreted these results, as well as the other

21   objective test results from the neuropsychological testing, and concluded that plaintiff had been

22   unable to work as a result of his cognitive limitations since his SAH in 2009.  In light of the

23   ALJ's failure to evaluate this aspect of Dr. Goldberg's opinion, the ALJ's purported adoption

24   of Dr. Cook's similar opinion is not supported by substantial evidence.  Indeed, it is not at all

REPORT AND RECOMMENDATION - 16

clear that limiting plaintiff to "only simple repetitive work tasks" and "simple changes" in the workplace prior to January 2012 would adequately accommodate plaintiff's "difficulty with memory and need for a less demanding environment" and enable him to work.  AR at 21.  As Dr. Goldberg pointed out in his evaluation, plaintiff's unsuccessful attempts to return to work, despite the assistance of DVR and his volunteer work as a bus driver for seniors, demonstrated how severely his cognitive limitations impacted his functioning in a work setting.  Accordingly, the ALJ also erred in evaluating Dr. Cook's opinion regarding plaintiff's "extremely low" working memory and related cognitive limitations, and the impact these cognitive limitations had on plaintiff's RFC prior to January 2012.

      B.    <u>The ALJ Erred in Evaluating the Other Source Opinions</u>

            *1.    Legal Standard for Evaluating "Other Sources"*

In order to determine whether a claimant is disabled, an ALJ may consider lay-witness sources, such as testimony by nurse practitioners, physicians' assistants, and counselors, as well as "non-medical" sources, such as spouses, parents, siblings, and friends.  *See* 20 C.F.R. § 404.1513(d).  Such testimony regarding a claimant's symptoms or how an impairment affects his ability to work is competent evidence, and cannot be disregarded without comment.  *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993).  This is particularly true for such non-acceptable medical sources as nurses and medical assistants.  *See* Social Security Ruling ("SSR") 06-03p (noting that because such persons "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists," their opinions "should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.").  If an ALJ chooses to discount testimony of a lay witness, the ALJ must provide "reasons that are germane to each witness," and may not simply categorically discredit the testimony.  *Dodrill,* 12 F.3d at 919.

2.     *Pamela Williams, A.R.N.P.*

Nurse Williams began treating plaintiff in April 2007.  AR at 372-73.  In June 2011, Nurse Williams reported that he "has an elevated factor VIII level which confirms a hypercoagulable state," which caused him to suffer from deep vein thrombosis and pulmonary emboli.  AR at 372.  She reported that "[s]ince his subarachnoid hemorrhage [on August 26, 2009], he has been involved in physical therapy and a rehab program thru (sic) Harborview Medical Center's CORP (Comprehensive Outpatient Rehabilitation Program).  He has significant problems organizing tasks and problems with his short term memory."  AR at 372. Finally, she recommended obtaining additional records from the CORP program at Harborview, and expressed her belief that "this patient does qualify for disability due to his ongoing cognitive deficits which appear to have reached a plateau at this point in time."  AR at 372.

The ALJ rejected Nurse Williams' opinion because she "was not an acceptable medical source.  Her opinion was less reliable."  AR at 22.  The ALJ asserted that Nurse Williams "provided an opinion of disability based on his mental functioning, even though the scope of her treatment largely entailed his physical condition.  She did not provide specific functional limitations.  Her statements were non-specific and overly general, even with respect to his memory and organization."  AR at 22.  The ALJ asserted that Nurse Williams' "statement about his qualification for disability was beyond the scope of a medical opinion because such determination was within the purview of the commissioner's role."  AR at 22.  Finally, the ALJ asserted that "her treatment notes do not reflect the level of severity seen in the letter.  For instance, in May 2011, she did not describe any problems with his mental functioning."  AR at 22 (citing AR at 386-87).

REPORT AND RECOMMENDATION - 18

The ALJ's stated reasons for rejecting Nurse Williams' opinions, especially when viewed in relation to the other medical opinions the ALJ erred in evaluating, are not supported by substantial evidence. As a threshold matter, the Court notes that although many of Nurse Williams' treatment notes focus on plaintiff's physical complaints rather than plaintiff's mental functioning because physical complaints were the stated purpose of plaintiff's visits, plaintiff's mental functioning – and particularly his problems with his short term memory – was also referenced in many of Nurse Williams' treatment notes. AR at 386, 404, 406. In fact, Nurse Williams incorporated the results of Dr. Cook's psychiatric evaluation dated May 25, 2010 into her treatment notes, including Dr. Cook's discussion of plaintiff's difficulties with getting lost and remembering addresses in his volunteer position driving an access van for seniors. AR at 408-09.

In addition, in May 2010 Nurse Williams noted that plaintiff "is status post subarachnoid hemorrhage that occurred in August 2009. He is currently in the Harborview Head Injury Program in DVR and passed a driver's test there, but needs an evaluation for commercial driver's permit in order to volunteer driving an access van in Lake Forest Park where he lives. This was the recommendation of his DVR folks." AR at 411. She noted that plaintiff will have "a GPS device to help him navigate as he has significant short-term memory problems." AR at 411. During her neurologic examination on that date, she noted that he "has little bit of trouble with balance with tandem gait. *His short-term memory has obvious impairment.*" AR at 412 (emphasis added).

The ALJ's rejection of Nurse Williams' opinions because she did not include more specific limitations regarding his memory and organization is also not supported by substantial evidence. As the plaintiff points out, Nurse Williams was plaintiff's long-time treatment provider. She saw him regularly since before August 2009, and oversaw all of his care at

REPORT AND RECOMMENDATION - 19

1  UWMC and the affiliated HMC.  The treatment records from this period contain many

2  references to cognitive problems beginning in August 2009.  For example, numerous

3  rehabilitation and physical therapy records refer to 2009 as the onset of plaintiff's cognitive

4  problems (AR at 599, 604, 610, 624, 629), and medical providers relied on plaintiff's wife

5  because plaintiff was a poor historian due to his SAH.  AR at 279, 281-86, 385.  Nurse

6  Williams was familiar with plaintiff's medical records, and as discussed above, clearly based

7  her opinion regarding plaintiff's memory problems, at least in part, upon the results of Dr.

8  Cook's psychiatric evaluation.  AR at 408-09.  Nurse Williams' opinion regarding plaintiff's

9  mental functioning was consistent with the opinions of Drs. Goldberg and Cook, and she also

10  linked the onset of his problems to plaintiff's SAH in 2009.  AR at 711 (noting that "It is my

11  professional opinion that his disability was due to the subarachnoid hemorrhage in 2009 that

12  changed his cognitive function and mood significantly.").

13      The ALJ was not obligated to give Nurse Williams' opinion regarding whether plaintiff

14  was disabled controlling weight, as that is an issue reserved to the Commissioner.  *See* 20

15  C.F.R. § 404.1527(e); SSR 96-5p.  However, the ALJ's other stated reasons for rejecting Nurse

16  Williams' opinions are not supported by substantial evidence.

17                          *3.    Leslie Sanders*

18      Plaintiff's wife, Leslie Sanders, completed a Thirty Party Function Report on July 5,

19  2011, indicating that plaintiff had trouble with his balance, memory and mood swings.  AR at

20  234-41.  He had difficulty standing for long periods of time and completing tasks, despite

21  having worked with DVR and HMC since May 2010.  AR at 234.  She noted that his activities

22  of daily living included helping with some chores, watching television, and playing video

23  games.  He sometimes went for walks, went to medical appointments, and attended a job club.

24  AR at 234.  He could drive and ride his bicycle, but was slower than he used to be.  AR at 238.

REPORT AND RECOMMENDATION - 20

He did not sleep well at night, was tired all day, and became frustrated and irritable.  AR at 235.  She provided many specific examples of what she characterized as plaintiff's "memory/understanding issues": she had to make lists for him, remind him to wash his face and brush his teeth, he would forget to turn off the stove, he had to call and ask her questions when he shopped, she paid all the bills for the family, he needed "many reminders" and also "repetition" to follow spoken instructions and complete tasks.  AR at 236-39.  She noted that prior to his injury, plaintiff had been able to use the debit card, pay bills, and make decisions.  AR at 238.

On May 18, 2012, Ms. Sanders submitted a second third party statement describing how her life with the plaintiff had changed since his SAH in August 2009.  AR at 261.  She noted that although plaintiff has "gone through a series of medical rehabilitations, tests and appointments" and took part in "Harborview's vocational program for over a year," even "after all this treatment he still suffers from many conditions."  AR at 261.  In addition to his physical problems, she asserted that "he has short term memory problems; he can not remember short term plans we have made, forgets to eat lunch and remembering his daily tasks are a problem . . . I try to set up lists for him to take care of tasks during the day but it seems he has difficulty getting going, he lacks initiative in any areas."  AR at 261.  By contrast, "[b]efore the traumatic brain injury Jeff was able to follow instructions at work and complete tasks with supervision."  AR at 261.  Ms. Sanders again described the many reminders plaintiff needed to complete tasks, and how she "often need[s] to remind him [of] details that he would have known prior to his injury.  He calls me many times a day to ask about thinks like what we are doing for the evening, where is a certain item and to tell me his plans."  AR at 261.

1        The ALJ summarized Ms. Sanders' July 5, 2011 report, concluding that "I find this

2   report consistent with this decision."  AR at 23.  However, the ALJ gave Ms. Sanders' opinion

3   from May 2012 "little weight for the period before January 2012.  She drafted this letter in the

4   present tense, and I agree that he was disabled in May 2012."  AR at 23.

5        The ALJ's rejection of Ms. Sanders' May 2012 opinion because she did not believe Ms.

6   Sanders' comments related to the period prior to January 21, 2012 is not supported by

7   substantial evidence.  Ms. Sanders' two letters are very consistent in their description of

8   plaintiff's cognitive limitations, such as plaintiff's memory problems.  With respect to the

9   second letter, Ms. Sanders expressly stated that she was describing how her life with her

10  husband had changed "[s]ince Jeff experienced a sub-arachnoids hemorrhage in August of

11  2009."  AR at 261.  She did not, for example, describe improvement in his cognitive condition

12  with therapy, and then a gradual worsening over time.  Rather, both of Ms. Sanders' third party

13  function reports describe a static condition and level of functioning since the SAH in 2009.

14       Similarly, the ALJ erred by rejecting Ms. Sanders' hearing testimony regarding

15  plaintiff's cognitive functioning for the same invalid reason.  Less than one month after Mr.

16  Sanders died, Ms. Sanders testified about the differences in plaintiff's functioning before and

17  after his August 2009 SAH.  AR at 42-89.  During her testimony, she repeatedly explained that

18  his memory lapses and cognitive difficulties were evident after Mr. Sanders' August 2009

19  SAH.  AR at 41-43, 55-56, 58, 61-62, 84.  The ALJ erred by rejecting this testimony because it

20  did not clearly refer to the period prior to January 21, 2012.  Ms. Sanders' testimony regarding

21  plaintiff's cognitive functioning was also consistent with the opinions of Dr. Goldberg, Dr.

22  Cook, and Nurse Williams.

23

24

4.       *Kristina Cortese and Bridget Anderson*

Plaintiff's friend Bridget Anderson also submitted a letter dated April 2, 2012, which described plaintiff's diminishing "mental tracking and attention span." AR at 258. For example, she noted that when he completes tasks "such as moving a family member, I notice that Jeff can only manage one instruction at a time[.]" AR at 258. He could "be asked to 1. Take apart a bed frame 2. Move the bed to the truck. 3. Deliver the bed to the new home. But he is unable to accomplish all three tasks. He will finish the first task, taking apart the bed, and then ask what should be done next." AR at 258. She observed, "it wasn't always like this for Jeff . . . since Jeff's brain injury, his self-esteem has waned, he has been unable to hold down a steady job, had to leave the National Guard, and he needs more assistance from his wife and friends." AR at 258. As a result of his "brain injury and his physical limitations due to his blood disease and ongoing blood clots," she opined that it would be difficult for him to work. AR at 258.

Mr. Sanders' mother Kristina Cortese also submitted a letter dated April 13, 2012, opining that her son's physical condition has deteriorated over time and describing her observations of him in January 2012. AR at 259. She stated that she has observed him suddenly lose his balance and fall. AR at 259. She also had to take him to the emergency room because of a blood clot in his leg, although he was allowed to leave because it was deemed to be "superficial." AR at 259. She opined that he "is really not able to safely do the most mundane of gardening chores." AR at 259.

The ALJ rejected these two lay opinions for the same reasons as Ms. Sanders' May 2012 opinion. AR at 23. Specifically, the ALJ asserted that "they described their observations of him mostly in the present tense or at least the period in and after January 2012." AR at 23.

REPORT AND RECOMMENDATION - 23

1  As a result, the ALJ gave their opinions "little weight" for the period before January 2012.  AR

2  at 23.

3          As discussed above with respect to Ms. Sanders' May 2012 opinion, the ALJ erred by

4  rejecting Ms. Anderson's opinion.  There was no basis for the ALJ to find that Ms. Anderson's

5  opinion was inapplicable to the period between August 2009 and January 2012.  Ms. Anderson

6  described plaintiff's mental functioning in the past, and then asserted that his functioning

7  changed "[s]ince Jeff's brain injury[.]"  AR at 258.  Thus, a more reasonable interpretation of

8  Ms. Anderson's opinion is that she was describing plaintiff's mental functioning since his brain

9  hemorrhage in August 2009.  AR at 258.

10          Ms. Cortese's letter focuses on plaintiff's physical limitations based upon her

11  observation of him during a January 2012 visit.  AR at 259 ("To see him physically reduced to

12  the person he is today breaks my heart.").  Although the ALJ seems to have interpreted her

13  opinion as describing a worsening of his balance and physical conditions beginning around

14  January 2012, Ms. Cortese stated that she only saw her son "almost every year" because she

15  lives in San Francisco, California.  AR at 269.  Thus, January 2012 appears to have been

16  significant only because it happened to be the date of their most recent visit.  AR at 259.  She

17  indicated that during this visit plaintiff suffered a fall in her presence as well as a superficial

18  blood clot in his leg.  AR at 259.  She did not describe his mental functioning at all, beyond

19  describing him as a "warm and loving person . . . [who] has had to adjust to a life that no

20  longer makes him that big guy coming to everyone['s] rescue."  AR at 259.

21          Accordingly, the ALJ erred by rejecting these opinions as being "irrelevant" to the

22  period between August 2009 and January 2012.  Even if this was true of Ms. Cortese's opinion

23  regarding plaintiff's physical limitations in January 2012, it was certainly not true of Ms.

24  Anderson's opinion regarding plaintiff's mental functioning "[s]ince Jeff's brain injury" in

REPORT AND RECOMMENDATION - 24

August 2009.  AR at 258.  Both Ms. Anderson's opinion and Ms. Cortese's opinions are also consistent with the opinions of Ms. Sanders, Dr. Goldberg, Dr. Cook, and Nurse Williams.

### 6.     Beth Ann Warner

Plaintiff's sister-in-law, Beth Warner, provided a lay witness statement on plaintiff's behalf describing how she had "seen him change since his brain injury."  AR at 260.  She noted that "since the injury I have seen that Jeff has a hard time staying focused in any conversation, especially in large groups.  He has a hard time following along what people are saying . . . He has terrible balance issues and coordination issues" as well as "ongoing blood clots[.]"  AR at 260.  She asserts that "he is clearly a different person now than he was before the hemorrhage."  AR at 260.  "I have seen Jeff change from a strong proud man that served in the National Guard, worked as a fisherman in Alaska and then on to a stable school bus driver to now being unfocused and unable to hold a job."  AR at 260.

The ALJ erred by failing to address Ms. Warner's opinion regarding plaintiff's cognitive limitations in her written decision at all.  In any event, the ALJ could not have rejected Ms. Warner's opinion – as she did the opinions of the other lay witnesses - as only describing plaintiff's functioning during "the period in and after January 2012."  AR at 23.  Ms. Warner explicitly linked the onset of plaintiff's mental limitations to his brain hemorrhage in August 2009, consistent with the opinions of Ms. Anderson, Ms. Sanders, Dr. Goldberg, Dr. Cook, and Nurse Williams.

B.     The ALJ's Decision that Plaintiff was Not Disabled Before January 21, 2012
       Is Not Supported By Substantial Evidence

As discussed above with respect to the medical and lay opinion evidence, plaintiff argues that the ALJ erred by finding plaintiff disabled only as of January 21, 2012, instead of on his alleged disability onset date of August 24, 2009.  Specifically, the ALJ found that as of January 21, 2012, plaintiff's impairments caused greater cognitive limitations that would cause him to be off task 20% of the workday.  AR at 19.  Plaintiff argues that the medical records and lay testimony, however, show that plaintiff's cognitive problems that caused him to be off task to this extent dated back to his August 2009 SAH, and "nothing of particular significance in terms of cognitive functioning occurred in January 2012."  Dkt. 12 at 4.  Rather, "the only thing that happened that month is that Mr. Sanders developed a superficial blood clot in his leg.  Far more significant were the two SAH's Mr. Sanders endured – the first in August 2009, the second in July 2012."  *Id.*

With respect to the ALJ's overall evaluation of the medical evidence in this case, plaintiff argues that although the ALJ relied heavily on the opinion of consultative psychological examiner Dr. Fantoni-Salvador to find that plaintiff did not have serious cognitive problems prior to January 2012, "this doctor did not have an accurate picture of Mr. Sanders' symptoms and limitations."  *Id.*  Plaintiff points out that had Dr. Fantoni-Salvador reviewed the medical records and lay testimony in this case, she would have learned that plaintiff had ongoing cognitive problems since his SAH in August 2009.  *Id.*  Plaintiff further argues that the neuropsychological evaluation performed by Dr. Goldberg at UWMC after Dr. Fantoni-Salvador rendered her opinion showed widespread cognitive difficulties, which Dr. Goldberg expressly linked to the SAH in August 2009.  *Id.* at 5.  In addition, plaintiff was found to have tumors in his spine that may have been causing mini strokes/bleeds.  Dkt. 12 at 5

(citing AR at 711). Dr. Fantoni-Salvador did not have the benefit of this information at the time of her July 2011 evaluation. Thus, the ALJ's reliance on Dr. Fantoni-Salvador's opinion, along with the opinions of the non-examining medical consultants, to find that plaintiff only became disabled in January 2012 because "the claimant had no severe mental impairment, at least with respect to the period before January 2012," was not supported by substantial evidence. AR at 20.

With respect to plaintiff's mental functional capacity before January 21, 2012, the Commissioner contends that the ALJ adequately accommodated Dr. Cook's opinion regarding plaintiff's working memory in the RFC assessment. Dkt. 15 at 6-7.[8] In addition, the Commissioner asserts that the ALJ properly considered Dr. Fantoni-Salvador's opinion regarding plaintiff's mental functioning because she "interpreted it in light of the entire record" which contained little evidence of any ongoing mental problems. *Id*. at 9. Finally, the Commissioner points out that Dr. Fantoni-Salvador's opinion was consistent with the opinions of non-examining state agency consultants Darrell Snyder, Ph.D. and James Bailey, Ph.D., who opined that plaintiff had no severe mental impairment. AR at 21 (citing AR at 107, 120).

---

[8] The Commissioner argues at length that the ALJ did not err in evaluating plaintiff's physical limitations. Specifically, the Commissioner argues that the ALJ reasonably relied on non-examining state agency physicians Drs. Hoskins and Thuline's opinions regarding plaintiff's physical functional capability prior to January 21, 2012, because plaintiff's activities and treatment history between August 2009 and January 2012 "showed his ability to engage in different physical tasks that involved his legs and arms" such as biking regularly, cooking, walking shopping, and exercising. Dkt. 15 at 4-5 (citing AR at 20-21, 286, 367). The ALJ adopted Drs. Hoskins and Thuline's conclusions that plaintiff was capable of "light work," except the ALJ reduced their assessment of plaintiff's walking/standing ability from 6 hours in an 8-hour workday to 2 hours "to reflect the uncertainty regarding his walking/standing capability and the recurrent nature of his leg problem." AR at 20-21, 109-110, 122-23. As discussed throughout this Report and Recommendation, the Court finds that the ALJ erred in evaluating the effect of plaintiff's mental, rather than physical, limitations since his August 2009 SAH.

REPORT AND RECOMMENDATION - 27

1    The Commissioner's arguments are unpersuasive.  As discussed in detail above, the

2    record reflects that plaintiff did have ongoing cognitive limitations, i.e., plaintiff's inability to

3    remain on task for 20% of the workday, which the ALJ ultimately found disabling.  The record

4    also reflects that plaintiff's cognitive problems began before January 2012.  For example, the

5    ALJ erred by failing to acknowledge the fact that Dr. Goldberg's May 2012 evaluation clearly

6    links the onset of plaintiff's disability to his "spontaneous subarachnoid hemorrhage in 2009,

7    [with] subsequent decline in his cognitive functioning."  AR at 528.  Dr. Goldberg's evaluation

8    was therefore inconsistent with the ALJ's conclusion that plaintiff's disability began on

9    January 21, 2012 because "the claimant had no severe mental impairment, at least with respect

10   to the period before January 2012."  AR at 21-22.

11       Similarly, Dr. Cook's May 25, 2010 psychological evaluation showed that plaintiff's

12   "ability to hold visual-spatial and auditory information falls within the Extremely Low range,

13   exceeding only 1% of his peers.  His score suggests he loses information from awareness more

14   quickly than do his age-mates."  AR at 328.  Dr. Cook found that his "scores overall indicate

15   that the claimant's working memory capacity, as estimated by the WMI, is in the Extremely

16   Low classification range."  AR at 329.  Thus, Dr. Cook's tests show that plaintiff's problems

17   with his memory preceded January 2012, which is consistent with Dr. Goldberg's

18   conclusions.[9]  In addition, the lay witness testimony in this case provides further support for

19   Drs. Goldberg and Cook's findings.

20       The ALJ's reliance upon Dr. Fantoni-Salvador's opinion that plaintiff was exaggerating

21   his cognitive and memory problems in July 2011, AR at 477, when Dr. Fantoni-Salvador did

22   not perform any testing apart from a mini-mental status examination, reviewed only Dr.

23

24       [9] The ALJ's statement that Dr. Cook's evaluation was "largely supportive" of the non-examining physicians Dr. Snyder and Dr. Bailey's assessments is also inaccurate.  AR at 21.

REPORT AND RECOMMENDATION - 28

Cook's report, and did not provide any basis for that opinion, is not supported by substantial evidence. AR at 475-77. For example, although Dr. Fantoni-Salvador did not perform any memory testing, she opined that plaintiff "has no deficits in auditory, immediate or delayed memory. He exhibits average cognitive functioning and had a good long-term work history." AR at 478. As discussed above, the testing and evaluations of Dr. Goldberg and Dr. Cook directly refute this conclusion.

Without more, the August and November 2011 opinions of non-examining state agency physicians Dr. Snyder and Dr. Bailey that plaintiff had no severe mental impairment also do not constitute substantial evidence to support the ALJ's decision. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding that the contrary opinion of a non-examining medical source does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion unless it is consistent with other independent evidence in the record); *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1201 (9th Cir. 2008) (holding that the Court may not rely on the opinion of a non-examining physician to cure the ALJ's erroneous rejection of an examining physician's opinion).

Finally, the Court agrees with plaintiff's contention that the record shows the blood clot plaintiff developed on January 21, 2012, was a comparatively minor event compared with plaintiff's subarachnoid hemorrhages that left him with residual cognitive deficits. In fact, it was diagnosed as a "superficial lower extremity thrombosis," and plaintiff was released from the hospital the same day in stable condition with instructions to contact his doctor and place warm compresses on the leg. AR at 691-93, 697. Substantial evidence does not support the ALJ's selection of this date and event, rather than plaintiff's SAH on August 24, 2009, as the

1    onset of plaintiff's disability.  In light of this finding, it is unnecessary to discuss plaintiff's

2    remaining assignments of error in detail.[10]

3              D.        Remand for Award of Benefits is the Appropriate Relief

4              The Court may direct an award of benefits where "the record has been fully developed

5    and further administrative proceedings would serve no useful purpose."  *McCartey v.*

6    *Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen*, 80 F.3d at 1292).  The Court

7    may find that this occurs when:

8              (1) the ALJ has failed to provide legally sufficient reasons for rejecting the
               claimant's evidence; (2) there are no outstanding issues that must be resolved
9              before a determination of disability can be made; and (3) it is clear from the
               record that the ALJ would be required to find the claimant disabled if he
10             considered the claimant's evidence.

11   *Id*. at 1076-77; *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that

12   erroneously rejected evidence may be credited when all three elements are met).

13             For all the reasons set forth above, the ALJ erred in improperly discounting medical

14   opinion evidence and lay opinion evidence establishing that plaintiff became disabled on

15   August 24, 2009, rather than January 21, 2012.  As a result, there are no outstanding issues that

16   must be resolved before a determination of disability can be made.  There is nothing to be

17   gained by sending this matter back for a second administrative hearing.

18

19

20

21             [10] Specifically, the Court need not consider whether the letters submitted to the Appeals
     Council by Dr. Goldberg and Ms. William following the ALJ's decision showed that
22   substantial evidence did not support the ALJ's decision.  As discussed earlier in this Report
     and Recommendation, Dr. Goldberg's original opinion already supported a finding that
23   plaintiff's disability commenced in August 2009.  In addition, the ALJ's erroneous evaluation
     of the medical and lay evidence in this case also rendered the ALJ's RFC assessment
24   erroneous.

1

VIII.   CONCLUSION

2        For the foregoing reasons, the Court recommends that this case be REVERSED and

3    REMANDED to the Commissioner with instructions to award benefits.  A proposed order

4    accompanies this Report and Recommendation.

5        Objections to this Report and Recommendation, if any, should be filed with the Clerk

6    and served upon all parties to this suit by no later than **February 3, 2015**.  Failure to file

7    objections within the specified time may affect your right to appeal.  Objections should be

8    noted for consideration on the District Judge's motion calendar for the third Friday after they

9    are filed.  Responses to objections may be filed within **fourteen (14)** days after service of

10   objections.  If no timely objections are filed, the matter will be ready for consideration by the

11   District Judge on **February 6, 2015**.

12       This Report and Recommendation is not an appealable order.  Thus, a notice of appeal

13   seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

14   assigned District Judge acts on this Report and Recommendation.

15       DATED this 20th day of January, 2015.

16

17

18                                        JAMES P. DONOHUE
                                          United States Magistrate Judge
19

20

21

22

23

24

REPORT AND RECOMMENDATION - 31